# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
13 MAR -5 PM 3:44

MICHAEL R. MERZ
UNITED STATES
MAGISTRATE JUDGE

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Sprint cellular telephone assigned<br>call number (202) 246-9838 | )<br>)<br>)<br>)<br>) | Case No. 3:13 mj 70 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A. This court has authority to issue this warrant under 18 U.S.C. sections 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the ___unknown___ District of _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. sections 841 and 846 | Conspiracy to distribute and possess with the intent to distribute controlled substance. |

The application is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Jason D. Via, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 5, 2013

*Judge's signature*

City and state: Dayton, Ohio

Michael R. Merz, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (202) 246-9838 | Case No. 3:13 mj 70<br>**Filed Under Seal** |

MICHAEL R. MERZ

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jason D. Via, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (202) 246-9838, subscribed to "Josh Fortner, PO Box 54988 Irvine, CA 92619" (hereinafter referred to as "TARGET TELEPHONE") and whose service provider is Sprint, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, KS 66251. The TARGET TELEPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

1. Affiant is an "Investigative or Law Enforcement Officer" of the United States Drug Enforcement Administration (DEA) within the meaning of Title 21, United States Code, Section 878. That is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. As a law enforcement officer, I have been employed by the Springfield, Ohio Police Department (SPD) since November 2003, and am currently assigned to the Drug Enforcement

Administration (DEA) Task Force, Dayton Resident Office. Affiant has conducted and participated in complex drug trafficking, conspiracy, and money laundering investigations which have resulted in arrests; execution of search warrants that resulted in the seizure of narcotics, narcotics proceeds, and other evidence of narcotics trafficking activities; and supervised the activities of cooperating sources (CS) who have provided information and assistance resulting in narcotics purchases. Through training and experience, Affiant is familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived there from. Through training and experience, Affiant is familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering.

2. I make this affidavit from personal knowledge based on my participation in this investigation, including witness interviews and reports by myself and/or other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause for the requested warrant, and does not contain all details or all facts of which I am aware relating to this investigation.

3. Affiant believes that the facts set forth in this affidavit set forth probable cause to believe that known and unknown members of a drug trafficking organization ("DTO") are committing and will continue to commit the following offenses:

a. Distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a);

b. Use of communications facilities to commit, facilitate, or further an act or acts which constitute a felony, in violation of Title 21, United States Code, Section 843(b);

c. Conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846.

There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

1. In summary, the DEA has been investigating a large scale drug trafficking organization (DTO) based in Mexico and that is responsible for sending kilogram quantities of heroin, cocaine, and marijuana to customers in southern Ohio for distribution. Many of these customers were introduced to the organization through Cesar LLAMAS ("LLAMAS"), an inmate incarcerated at a state prison facility in London, Ohio ("LCI"). The customers were either inmates released from LCI or associates of presently incarcerated LCI inmates. To facilitate the drug trafficking, the customers communicated with Gabriel HERNANDEZ-RAMIREZ ("HERNANDEZ"), an individual who lived in Texas. Through these communications, HERNANDEZ arranged for deliveries of heroin, cocaine and marijuana to the DTO's customers, and directed the collection from the customers of money involved in the drug trafficking activity. One of the customers who worked with HERNANDEZ to distribute controlled substances was Ryan YANCEY ("YANCEY"). It is Affiant's belief that the TARGET TELEPHONE is

presently used by Ryan Yancey. During this investigation, YANCEY has been identified as a Springfield-based drug trafficker who purchases and coordinates shipments of heroin and cocaine received from the DTO.

2. On 6/11/12, investigators obtained court authorization to intercept cellular telephone (310) 303-8605, used by HERNANDEZ. Numerous conversations took place involving HERNANDEZ and the southern Ohio customers, and calls between HERNANDEZ and individuals on the supply side of the organization. Among those intercepted speaking to HERNANDEZ about drug trafficking was YANCEY. During the period of interception, YANCEY was intercepted speaking to HERNANDEZ over cellular telephone (404) 697-4814, which is an AT&T pre-paid account. Affiant reviewed toll data for (310) 303-8605, and observed that YANCEYS' (404) 697-4814 phone was in contact with HERNANDEZ' (310) 303-8605 approximately 113 times from 5/13/12-6/28/12. On 6/23/12, investigators took enforcement action against several couriers and a customer, which resulted in HERNANDEZ discontinuing use of (310) 303-8605 and why contact between that phone and YANCEYS' phone ceased.

3. The content of the calls intercepted over (404) 697-4814 were consistent with the type of conversation intercepted during calls between HERNANDEZ and other drug traffickers. Affiant is aware of YANCEY'S voice through an interview with YANCEY conducted by S/A Lucas and the Affiant on 1/2/2013. The following is an excerpt of an intercepted call that took place between HERNANDEZ and YANCEY on 6/14/12.

PHONE: 310-303-8605

CALL: 733

INCOMING: 404-697-4814

TIME: 19:26

PARTICIPANTS:     HERNANDEZ  &  YANCEY

[BEGINNING OF CALL]

HERNANDEZ: Hey, what's up?

YANCEY: I'm about to go to the gym.

HERNANDEZ: I got somebody ready to do something, how long will you be at the gym?

YANCEY: What's it about?

HERNANDEZ: Well you know the white T's are 2 ½ weeks out that's a sure thing. I have "boy" for you at 8-0, it's ready and everything.

YANCEY: Is it still top notch?

HERNANDEZ: Yea you're working with us now, I'm trying to help you out.

*This is only an excerpt of the call as it continues on for several more minutes.

Affiant believes that the intercepted call described immediately above was about drug trafficking. The reference to "white T's" was about kilograms of cocaine that will be available in several weeks and the "boy" is a kilogram of heroin for "8-0" which is $80,000. "Boy" is a commonly used slang term for heroin.

4. On June 14, 2012, search warrants were conducted at locations connected to Deron Castle ("CASTLE") in Clark County, Ohio and Champaign County, Ohio by members of the

Springfield Police Division and DEA. CASTLE had been previously observed meeting with HERNANDEZ during surveillance in the spring of 2012. As a result of search warrants, 1,500 pounds of marijuana and approximately $280,000 in US Currency were recovered. CASTLE was arrested. During a subsequent interview, CASTLE stated he had received kilogram quantities of cocaine and heroin from HERNANDEZ. CASTLE in turn supplied some of the cocaine to YANCEY for distribution throughout the Springfield area. CASTLE indicated that YANCEY was a large scale drug trafficker in Springfield, Ohio and possibly had his own connections to a Mexican source of supply (SOS).

5. Throughout the summer of 2012, investigators seized drugs and money based on interceptions of Gabriel HERNANDEZ-Ramirez. On 6/16/12, investigators seized approximately 1 kilogram of heroin and over $60,000 from a courier who had traveled from Chicago to deliver heroin to the DTO's customers in Dayton (as confirmed by intercepted phone calls). On 6/23/12, investigators seized over $300,000 during three traffic stops, money which was destined for individuals in Chicago and Texas per the intercepted phone calls. On 8/8/12, investigators intercepted approximately one kilogram of heroin that had been shipped via parcel service and which was destined for a customer in Dayton. On 8/10/12, two couriers from Chicago with approximately two kilograms of heroin were arrested by investigators while they tried to meet another customer in Dayton. The meeting was arranged after HERNANDEZ and a source of supply in Chicago had multiple phone conversations (which were intercepted).

6. In August and September, 2012, several search warrants were executed on DTO customers Milton WILLIAMS and Jeremy KELSEY at locations in Dayton and Springfield, Ohio.

Investigators located guns, heroin, marijuana, cell phones, banking deposit slips and other documents, and other instrumentalities of drug trafficking (not all listed items were found at both residences). Additionally, a search warrant was conducted at HERNANDEZ' residence in Grand Prairie, Texas. During the search warrant at HERNANDEZ' residence, investigators located a list of phone numbers that included DTO customers, including (216) 262-7213 attributed to the name "Ryan" (believed to be YANCEY). Tolls records for (216) 262-7213 were reviewed, and (216) 262-7213 and TARGET TELEPHONE were found to have contacted (5) common phone numbers.

7. During the months of October, November, and December 2012, Affiant interviewed a cooperating defendant (hereinafter referred to in this Affidavit as "CD1"). CD1 has provided information about CASTLE, WILLIAMS, KELSEY, YANCEY, and others. CD1 is believed to be truthful and credible based on several facts that were able to be corroborated by investigators. CD1 indicated YANCEY began working with the organization to receive drugs starting in late May or early June, 2012. CD1 stated CD1 spoke to YANCEY via cell phone numerous times until August 2012, and facilitated the distribution of heroin to YANCEY in kilogram quantities during that time period. CD1 also stated that CD1 was aware that YANCEY was an associate of CASTLE, and that YANCEY wanted to obtain kilograms of cocaine in addition to heroin.

8. In December, 2012, Affiant was present for interviews conducted with a cooperating defendant referred to in this affidavit as "CD2." CD2 made statements that were corroborated by investigators and is believed to be credible. CD2 stated CD2 worked for HERNANDEZ in the capacity of a courier and delivered heroin to customers and collected proceeds. CD2 stated CD2

picked up heroin from a customer in Dayton on several occasions and delivered the heroin to YANCEY in Springfield, Ohio. CD2 also stated that CD2 collected cash proceeds from YANCEY that were transported back to another customer in Dayton, OH. CD2's statements are consistent with CD1.

9. On December 30, 2012, YANCEY was the victim of an attempted kidnapping that occurred in Springfield, Ohio. During the incident, officers collected three cell phones from the scene that YANCEY later identified as belonging to him, one of which is TARGET TELEPHONE. On January 2, 2013, YANCEY was interviewed by S/A Lucas and Affiant while at the Springfield Police Department on the matter of the kidnapping. During the interview, S/A Lucas played recordings of intercepted phone calls between YANCEY and HERNANDEZ. The phone conversations were similar to the one listed above regarding drug activity. YANCEY acknowledged that he was the person on the phone during the calls. YANCEY also gave written consent for the search of his three cell phones (including TARGET TELEPHONE) found at the scene of the kidnapping. During the search of the TARGET TELEPHONE, officers located evidence that YANCEY was using TARGET TELPHONE for suspected drug activity. In the contact list for the phone were several names and associated phone numbers of individuals listed by initials or nickname. Upon reviewing those nicknames/phone numbers, Affiant recognized them to be phone numbers for persons previously identified as involved in drug trafficking in the Springfield area, based on a combination of toll analysis and phone records, information from confidential sources, and information developed by other investigators in Springfield. One example was an individual listed as "Freeze" at (407) 412-3061. "Freeze" is believed to be a Springfield marijuana and cocaine dealer. A text from "Freeze" to the TARGET TELEPHONE

read: "My nigga want 4 of the soft music.....I don't wanta give him my 3 for real." Affiant believes that the above text describes Freeze's desire to obtain (4) ounces of powder cocaine ("4 of the soft music") from YANCEY to sell to an associate, while holding onto the (3) ounces he (Freeze) already possessed at the time. Affiant knows that a common slang term for powder cocaine is "soft." Traffickers will commonly use whole numbers to describe ounces or kilograms of a particular drug.

10. After searching TARGET TELEPHONE, Affiant sent a subpoena to Sprint for toll records for the TARGET TELEPHONE. Affiant believes that YANCEY is still using the TARGET TELEPHONE based on past and present call patterns. There has been no interruption of service or switch in subscriber information that would suggest a new user. Based on the contacts/text saved in the TARGET TELEPHONE, investigators believe that the phone is primarily used by YANCEY for communications with other drugs dealers, both known and unknown, in the Springfield area.

11. Based on the above, Affiant believes that the TARGET TELEPHONE is still being utilized by YANCEY. Affiant also believes that the TARGET TELEPHONE is being used to further criminal activities and to commit the offenses listed above. By obtaining the GPS location data for the TARGET TELEPHONE, Affiant believes that the GPS location data will assist with identification of locations where YANCEY goes to store or sell controlled substances, the identification of other co-conspirators, and possible locations where YANCEY may be staying, among other information.

12. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

13. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the TARGET TELEPHONE, including by initiating a signal to determine the location of the TARGET TELEPHONE on Sprint's network or with such other reference points as may be reasonably available.

## AUTHORIZATION REQUEST

1. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

2. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the TARGET TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. Moreover, to the extent that the warrant authorizes the seizure of any tangible property, any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

3. I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

4. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

5. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

_____
Jason D. Via, Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this 5th day of March, 2013.

_____
Honorable Michael R. Merz
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (202) 246-9838, subscribed to "Josh Fortner, PO Box 54988 Irvine, CA 92619" (hereinafter referred to as "TARGET TELEPHONE") and whose service provider is Sprint, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

2. Information about the location of the TARGET TELEPHONE that is within the possession, custody, or control of Sprint.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the TARGET TELEPHONE described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the TARGET TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).